# IN THE UNITED STATES DISTRICT COURT
## FOR MARYLAND

| | | |
|---|---|---|
| MELODY SOUTHARD | ) | |
| 1513 Cedar Street | ) | |
| Pocomoke, MD 21851 | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 14-323 |
| | ) | |
| WICOMICO COUNTY BOARD | ) | |
| OF EDUCATION | ) | |
| 101 Long Avenue | ) | |
| Salisbury, MD 21802 | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| Serve On: | ) | |
| | ) | |
| John Fredericksen | ) | |
| Superintendent | ) | |
| 101 Long Avenue | ) | |
| Salisbury, MD 21802 | ) | |
| _____ | ) | |

## COMPLAINT

By and through undersigned counsel, Plaintiff files the following complaint and states as follows::

1.      This Court has subject matter jurisdiction over this action pursuant to 28 USC § 1331 because this case involves a federal statute.

2.      Venue is proper in this Court pursuant to 28 U.S.C.  § 1391(a) since the acts and omissions complained of occurred in the State of Maryland.

3.      Plaintiff has been a teacher employed by the Wicomico Board of Education  ("WCBOE") since January 2008.

4.      The WCBOE is a "public entity" as that phrased is used in the ADA and the Rehabilitation Act.

5.      Plaintiff's son had always attended the same school where she was employed.

6.      Since 2007, Plaintiff has had physical custody of her son (the "Minor Child"), and the father has specified visitation.

1

7.      In the 2010-2011 academic year, a change in administration was made at Pemberton, and Curtis Twilley was assigned as Principal and Antoinette Perry was assigned as Assistant Principal.

8.      Christopher Bradley, the father of the Minor Child, had a history of ignoring school rules, being rude to school staff, and being confrontational.   The previous school administration managed to effectively handle these issues so that it did not affect the Plaintiff's work environment or the Minor Child's school environment.

9.      On January 27, 2011, Twilley held a meeting at which he determined that the school was no longer going to enforce the gluten free diet that The Minor Child has been on since 2008.  The medically recommended diet was placed in his IEP and the school had been abiding by the statement agreed upon since the IEP meeting in 2008.

10.      Twilley also raised the possibility of revoking The Minor Child's special permission to attend Pemberton.

11.      On February 16, 2011, Plaintiff had a meeting with Katy Benton, the school district's autism specialist, to discuss the behaviors that could result from Plaintiff's son not remaining on the diet throughout the school day.

12.      Benton provided Plaintiff with two types of documents that she had created for other students to document behaviors.  She explained how the teachers would document daily and that Plaintiff was to choose the form that would better fit the behaviors that Plaintiff believed her son would exhibit most.  Then she would meet with his teachers and explain how to collect the data on the form.

13.      Plaintiff followed up with her by email on February 28, 2011 and March 3, 2011; however Plaintiff received no response.

14.      On April 20, 2011, Plaintiff saw Benton in person and asked her why she had not responded to Plaintiff's follow up emails or provided the teachers with a data form.  She explained that Twilley told her she was not allowed to be involved.

15.     On April 26, 2011, Plaintiff composed a letter to Twilley explaining her concerns about The Minor Child's care at school and proposing a solution.

16.     On April 26, 2011, Plaintiff also provided a letter to Becky Rementer, the Pemberton school nurse, requesting that an Individualized Healthcare Plan ("IHP") be developed for The Minor Child and then attached to his IEP.

17.     Plaintiff was contacted via email on April 28, 2011 by Dr. Margo Handy, assistant superintendent, regarding the IHP.

18.     Handy had reviewed the letter Plaintiff sent Twilley and informed Plaintiff that an IHP would be developed for The Minor Child and that the school staff would work with Plaintiff to develop it.

19.     After waiting several days and not being contacted by Twilley or Rementer regarding Dr. Handy's instructions, Plaintiff called the nurse to inquire as to when they could meet regarding the IHP.  She had not been notified by Twilley of Dr. Handy's email.

20.     Plaintiff met with Twilley on May 9, 2011 after sending him an email regarding the school's refusal to recognize the need for the diet.

21.     At the meeting, Plaintiff informed him that it had come to her attention that he had informed teachers that 1) they were not to monitor what The Minor Child ate in the classroom, 2) the nurse was not to monitor his symptoms or instruct the teachers what he could eat, 3) they were not to monitor what he ate and if the father packed an inappropriate lunch and Plaintiff sent in an appropriate lunch they were to just tell The Minor Child to pick which one he wanted to eat.

22.     On May 11, 2011 Deputy Goldberg came to Pemberton  and spoke with Plaintiff regarding several issues.  Plaintiff informed him of what had been taking place regarding Bradley harassing the school staff,  and Twilley's lack of ability to protect the staff and Plaintiff from harassment.

23.     Plaintiff explained how this was affecting the IEP staff that had worked so well with her son for the past several years.  Goldberg stated he would speak with Twilley regarding his duty to protect staff from

Bradley's bullying and harassment.  He suggested that Plaintiff speak with the assistant superintendant as a parent to address the issues regarding her son.

24.     Goldberg also advised Plaintiff of her parental right to have Goldberg attend the next IEP meeting so that if Bradley began to display any type of disrespectful attitude, bullying, or harassment then he would be able to interject and inform him that he had to be respectful or he would be escorted out of the meeting.

25.     An IHP was developed and presented to Plaintiff for review on May 13, 2011.  Plaintiff signed for the information to be shared with the school staff.

26.     Approximately one week later, Plaintiff and her husband, Ron Southard, visited the nurse's office to thank her for taking the time to develop the IHP.  She informed us that even though she had created it and Plaintiff had signed it, she was told "by a supervisor" to not implement it.

27.     On May 23, 2011, Plaintiff and Southard emailed Handy and requested a meeting to discuss the many issues that had occurred due to Twilley's negligent attitude towards The Minor Child's special needs and to hopefully come to an agreeable resolution.

28.     On May 25, 2011, Plaintiff and Southard attended a meeting with Handy, Twilley and Perry.

29.     At the conclusion of the meeting, Handy issued several directives to Twilley including  1)  hold a meeting with The Minor Child's teachers to inform them to immediately begin communicating with Plaintiff in response to her requests concerning his behaviors  2) provide Plaintiff with the documentation Plaintiff had previously requested 3) allow The Minor Child to have a snack basket in the classroom with gluten free snacks, as he has had for the past several years before the basket was sent home with The Minor Child about a month prior; and  4) contact Bradley and inform him that there will be no more harassment of the staff and that for all future communications to be directed to the principal only.

30.     Handy told Perry that she was to work with Twilley to follow through and to keep each other informed and involved of this situation.

31.     Before the meeting ended, Handy mentioned that even though Plaintiff had not brought it up, she must be wondering if this would negatively impact any aspect of her job.  Handy assured Plaintiff that she was an "excellent teacher" and that Plaintiff need not worry about it at all.

32.     The next day Plaintiff inquired of several staff to see if the items discussed during the May 25th meeting took place as discussed.  They had not.  The teachers were instead told to focus on the upcoming IEP meeting and to direct all of Plaintiff's requests there and not to discuss or share anything with Plaintiff until then.  Plaintiff also asked several of them why they never responded to her email regarding documenting his diet related behaviors.  Each response was the same.  "Twilley told us we were not allowed."

33.     On June 1, 2011, Plaintiff attended an IEP team meeting to discuss the implementation of the diet as a related service in The Minor Child's IEP.  It was stated that since there was no IHP created then there could be no discussion of whether to add it to the IEP or not.

34.     Lynn Smoak, Supervisor of Special Education Compliance, stated that the school district's policy was that a child needed a current physician at all times or an IHP could not be implemented at school. Plaintiff asked where she could find a copy of that policy and was told Karen Smith had contacted them and told them this the night before the meeting.

35.     At the close of the meeting, Plaintiff specifically requested the nurse conduct her own health care assessment of her son and develop a health care plan per the Maryland State School Health Services Guidelines. Plaintiff was told that under their policy the nurse did not have the authority.  Plaintiff was told that the WCBOE had their own policy and did not follow the Maryland guidelines.

36.     Plaintiff asked where she could find the WCBOE policy that took away the nurse's expertise and role in education.  Plaintiff was told to direct any nursing questions to Karen Smith. Plaintiff emailed Karen Smith after the meeting, however Smith never responded.

37.     Since Plaintiff could not resolve the issues revolving around her son with the principal, Plaintiff addressed the issues with the assistant superintendent; however Twilley ignored the assistant superintendent's

directives and instead attempted to intimidate the Plaintiff by threatening her career if she continued to advocate for her son's special needs.

38.     On June 3, 2011, Plaintiff received an appointment notice from Human Resources of a meeting scheduled and advising Plaintiff of her right to have union representation.

39.     To that date, Plaintiff had not been made aware of any performance issues.  When Plaintiff inquired as to the reason, she was only informed that it was related to special education.

40.     On June 6, 2011, Plaintiff received her end of the year evaluation with Twilley and Dr. Judylynn Mitchell.  Although it was lower than any other previous evaluation Plaintiff had received in Wicomico County, it was overall satisfactory.  It contained no unsatisfactory ratings, 20 satisfactory ratings, and 11 commendable ratings.  One of the commendable ratings was in the area "Develops rapport with other school employees and parents."

41.     On June 7, 2011, Plaintiff attended the scheduled meeting with union representative Virginia Riggs.  Stephanie Moses, Director of Human Resources, informed Plaintiff that Plaintiff was "borderline insubordinate" for not accepting Twilley's position regarding what Plaintiff was entitled to as a parent and what services the school would provide for the Minor Child.

42.     Plaintiff protested that she was not incorrect requesting what the Minor Child or Plaintiff was entitled to by law.

43.     Stephanie Moses responded "This is his school and he can run it whatever way he likes!"

44.     Plaintiff again requested a copy of the WCBOE policy that stated a student had to have a current physician in order for an IHP to be active, and affirmed that if, in fact, this was the policy she would accept it and would not be making further requests.

45.     Plaintiff continued that as a parent, she believed her requests were legal and appropriate per the Maryland State School Health Guidelines as Plaintiff had not been provided with anything that invalidated the accuracy of her request for an IHP.

46.     Plaintiff was told that she had created a hostile workplace.  Susan Jones, Director of Elementary Education, commented that Plaintiff's relationship at Pemberton and with her colleagues was "irreparably damaged" by her actions.

47.     Bonnie Walston, Supervisor of Special Education, blamed Plaintiff for creating a hostile workplace.  Unbeknownst to the Plaintiff, Walston had already predetermined that The Minor Child's special education services would soon be removed.

48.     On June 9, 2011, Plaintiff received a letter of reprimand for the requests she had made about her son's IEP.  Plaintiff was also involuntarily transferred to another school without just cause.

49.     Plaintiff requested a meeting with the Superintendent, John Frederisksen, in accordance with their contract, however her request was ignored.

50.     Despite being informed at the IEP meeting as well as the Human resource meeting that Plaintiff could request a copy of the policy WCBOE was claiming to use, no such policy was ever provided in response to Plaintiff's inquiries.

51.     After receiving no response from Karen Smith, Plaintiff spoke with Donna Mazyck, Health Services Specialist at DE, on June 13, 2011.  Mazyck called Karen Smith and informed her to answer Plaintiff's questions and provide Plaintiff with a copy of the policy they were using.

52.     That afternoon, instead of speaking with Plaintiff, Karen Smith called Twilley.  Plaintiff received an email from Twilley that Plaintiff had to send him any questions in order to receive an answer from Karen Smith.

53.     Plaintiff forwarded Twilley the same email she had previously sent Karen Smith as well as an additional paragraph explaining what Plaintiff specifically was attempting to understand and needed to be provided answers to.  To date, Plaintiff has never received a response from Karen Smith.

54.     Southard subsequently requested a copy of the policy through the FOIA, and the WCBOE superintendent responded that all current local policies were online and provided a link to the exact same Maryland State School Health Services Guidelines which Plaintiff had referred to at the IEP meeting.

55.     Southard also followed up by speaking with Fredericksen regarding the retaliation Plaintiff was being subjected to by being involuntarily transferred.  Fredericksen claimed no knowledge of the transfer and stated that it could be resolved through a grievance instead of personally correcting the situation.

56.     Plaintiff's union subsequently composed a grievance on her behalf.

57.     At a September 2, 2011 meeting, Human Resources and the principal agreed to remove the reprimand letter from Plaintiff's personnel file, however, Stacy Messick, Specialist of Employee Relations, threatened Plaintiff's career.

58.      Several days later Messick threatened further disciplinary action if Plaintiff continued speaking with the members of the IEP team.

59.     On October 5, 2011, a meeting was held at the union's WCEA office to address Plaintiff's ongoing concerns regarding the retaliation.  In attendance were Jackie Harris, Dave White, Larry Ginsburg, and Plaintiff.  Plaintiff was informed that the union would no longer pursue this since the reprimand letter was removed.  Plaintiff was to contact them if she experienced any further signs of retaliation such as Plaintiff receiving negative observations or the school district removing The Minor Child's IEP.

60.     In addition, Twilley has engaged in a campaign of retaliation of harassment, including but not limited to (1) making numerous unsubstantiated claim in reference to allegations made by other staff members; (2) humiliating Plaintiff in front of her peers by belittling her knowledge of the special education process; (3) allowing Plaintiff to be harassed in the workplace by Bradley to the staff.  Twilley created a hostile workplace, not only for allowing Chris Bradley to harass staff, but also with his continual comments reflecting his attitude; (4) being subjected to an HR meeting to reprimand Plaintiff for advocating for her son; (5) involuntarily transferring Plaintiff to another school.

61.     Further, since being transferred to West Salisbury, Plaintiff has been subjected to retaliation, including, but not limited to:  (1) tampering with technology equipment so Plaintiff is unable to stay informed with the rest of the staff; (2) being accused of stealing a laptop; (3) receiving observation evaluations more critical than even a first year unqualified teacher would receive, degraded by rude comments, talked down to in

front of staff, and set up to appear like Plaintiff is ignoring a parent; (4) receiving inaccurate and degrading evaluations in which Plaintiff's performance as a teacher is rated as unsatisfactory; being placed on Administrative leave at the end of the day due to a false child abuse report filed by Wright and not being allowed to return to even though Plaintiff was cleared of all charges by the detective.

62.     For the 2012-2013 school year, Plaintiff was transferred to Beaver Run Elementary. Throughout the school year, Plaintiff was subjected to constant verbal and written reprimands addressing a variety of complaints from allegedly insufficient lesson plans to having difficulty staying awake during a meeting to how the classroom is organized.  None of the other seven Kindergarten teachers were subjected to this type of treatment or heightened scrutiny.

*63.*     The school engaged in a process of inflating the scores for Plaintiff's son on his benchmark booklet by, for example, providing him with answers, narrowing choices down for him, writing answers for him while being tested.  The purpose of this was to create evidence for the school to use claiming that Plaintiff's son did not have any educational need for IEP/504.

*64.*     Plaintiff requested to review the benchmark booklet with Gary Doss, Testing Coordinator, however he was instructed by Walston that he was not to be involved.

*65.*     Plaintiff subsequently filed a complaint with FCPO, which resulted in the FCPO informing Manisha Kavadi, attorney for the school, that the school was out of compliance and to allow Plaintiff access to view the benchmark booklet.

66.     On December 20, 2012, Plaintiff met with Walston and testing coordinator Gary Doss to review the benchmark booklet for her son.   Despite being shown the testing violations, Doss refused to take any action to correct the situation.

67.     On December 21, 2012, Plaintiff contacted MSDE regarding the testing violations however was informed that the local testing coordinator was in charge of addressing this issue.

68.     Less than one month later, the school began to retaliate against Plaintiff due to her complaints regarding the benchmarks.

69.      On January 14, 2013,  School administration begins requesting a doctor's note/court documentation whenever Plaintiff requested leave.

70.      Administration also confiscated all of Plaintiff's benchmark recording sheets, as well as her class Progress Reports and scheduled a meeting with Human Resources.

71.      On February 4, 2013,  Plaintiff attended a meeting with Human Resources regarding her "obligations" to the school which resulted in a written reprimand placed in her file.

72.      On February 26, 2013, the administration conducted an observation of Plaintiff's teaching on a day that they were aware she was coming in a half hour late since they had preapproved her request.  The observers were overly critical of Plaintiff in their observation.

73.      The administration/HR discussed putting a letter of reprimand in Plaintiff's file.

74.      On May 31, 2013, the principal and the vice principal conducted another observation of Plaintiff's teaching for over an hour.  Plaintiff received an overall satisfactory.  This was included in Plaintiff's file but the administration refused to remove the negative observation.

75.      On June 10, 2013, Plaintiff received her final evaluation, which was overall satisfactory although some subcategories were unsatisfactory.

76.      On July 10, 2013, Plaintiff  discovered a negative letter that Mrs. Wright from West Salisbury had placed in her personnel file.  Plaintiff informed her union that this violated provisions in the union contract that stipulate that all employees will be made aware of any unfavorable material by signing that they are aware of it.

77.      On July 15, 2013,  Human Resources agreed to remove the letter.

78.      Since November 7, 2013, Plaintiff has been on FMLA leave due to stress caused by her treatment by WCBOE.

## COUNT I
### (Violation of Americans with Disabilities Act – Retaliation)

79.     Paragraphs 1-78 are realleged and incorporated by reference herein.

80.     The WCBOE is a public entity as that phrased is used in the ADA, and is therefore obligated to abide by the ADA's requirements.

81.     The Minor Child is an individual with a disability under the ADA.

82.     The Minor Child is a "qualified individual" under the ADA because he is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by WCBOE.

83.     The Minor Child is "otherwise qualified" academically at WCBOE because he can meet WCBOE's educational requirements with a reasonable accommodation.

84.     Plaintiff, as the mother of the Minor Child was subject to retaliation for having advocated as a parent for the reasonable accommodations to which the Minor Child is entitled.

85.     Such retaliation includes, but is not limited to,  Twilley (1) making numerous unsubstantiated claims in reference to allegations made by other staff members; (2) humiliating Plaintiff in front of her peers by belittling her knowledge of the special education process; (3) allowing Plaintiff to be harassed in the workplace by Bradley to the staff; (4) isolating Plaintiff from her peers; (5) being subjected to an HR meeting to reprimand Plaintiff for advocating for her son; (6) involuntarily transferring Plaintiff  to another school; (7) removing Plaintiff's access to privileges that other teachers received.

86.     Such retaliation includes, but is not limited to,  the following occurring since Plaintiff  was transferred to West:  (1) tampering with technology equipment so Plaintiff is unable to stay informed with the rest of the staff; (2) being accused of stealing a laptop; (3) receiving inaccurate and degrading observations in which Wright rates Plaintiff's performance as a teacher as unsatisfactory; (4) degraded by rude comments,

11

talked down to in front of staff, and set up to appear like Plaintiff was ignoring a parent; (5) being placed on Administrative leave at the end of the day due to a false child abuse report filed by Wright; (6) creating dilemmas that would result in negative feedback on her evaluations with no possible solution provided despite Plaintiff's attempts to address the situations.

87.     Such retaliation includes, but is not limited to, the following occurring since Plaintiff was transferred to Beaver Run:  (1) subjected to heightened scrutiny which unjustly resulted in constant verbal and written reprimands; (2) several negative performance observation ratings which were inaccurate and contradictory; (3) placed on a Performance Improvement Plan

88.     Such retaliation includes, but is not limited to, the following occurring since Plaintiff removed The Minor Child from WCBOE; (1) Walston interfered with the IEP process at The Minor Child's new school district; (2) Walston participated in causing an investigation to be launched regarding Plaintiff's residency; (3) using Bradley as their pawn throughout Plaintiff's filed due process complaint to avoid being held accountable for their actions regarding The Minor Child's education and in return offering to help Bradley's custody attorney in his dispute with the Plaintiff; (4) refusing to grant Plaintiff access to portions of The Minor Child's educational record.

89.     The ADA prohibits retaliation, coercion or threats against individuals who file complaints under the ADA.  28 C.F.R. § 35.134.

90.     The above described retaliation against Plaintiff violates the ADA, and Plaintiff has been damaged as a proximate result thereof.

## COUNT II
### (Violation of Section 504 of the Rehabilitation Act of 1973 - Retaliation)

91.     Paragraphs 1-90 are realleged and incorporated by reference herein.

92.     WCBOE is a public entity that receives federal assistance, and is therefore obligated to abide by the requirements of the Rehabilitation Act.

93.     The Minor Child is an individual with a disability under the Rehabilitation Act in that he has a physical impairment that substantially limits one or more major life activities.

94.     The Minor Child is an "otherwise qualified individual" under the Rehabilitation Act because he is an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by WCBOE.

95.     The Minor Child is "otherwise qualified" academically at WCBOE because he can meet WCBOE's educational requirements with a reasonable accommodation.

96.     The above-described accommodations are "reasonable" under the Rehabilitation Act because providing the accommodation would not fundamentally alter WCBOE's educational program, and the accommodation would not involve an undue financial or administrative burden for WCBOE.

97.     Section 504 prohibits retaliation for filing a complaint under Section 504 in order to advocate for a right protected by that section. 34 C.F.R. § 104.61.

98.     The above described retaliation against Plaintiff violates the Rehabilitation Act, and Plaintiff has been damaged as a proximate result thereof

WHEREFORE, Plaintiff requests the following relief:

a.      Compensatory damages in an amount to be proven at trial, but which are at a minimum, $300,000;

b.      Punitive damages in the amount of $300,000;

c.      Attorneys' fees and costs;

d.      All other relief this Court deems appropriate.

Respectfully submitted,
              /s/
_____
Michael P. Coyle, Esq.
THE LAW OFFICES OF CHAIFETZ & COYLE
7164 Columbia Gateway Drive, Suite 205
Columbia, MD 21046
443-546-4608 (Tel.)
443-546-4621 (Fax)

Attorney for Plaintiff

DATED:        January 31, 2014